IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

_____
                                    )

UNITED STATES OF AMERICA          )

                                    )

and                                    )

                                    )

the STATE OF NEBRASKA         )

                                    )

                Plaintiffs,    )      Case No.

                                    )

               v.                    )

                                    )

BIG OX ENERGY - SIOUXLAND, LLC; )
NLC ENERGY VENTURE 30, LLC.   )

                                    )

               Defendants.   )
_____)

## COMPLAINT

      Plaintiffs, the United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Nebraska, by the authority of the Attorney General of Nebraska, acting at the request of the Nebraska Department of Environment and Energy ("NDEE"), file this Complaint and allege as follows:

## NATURE OF ACTION

1.  This is a civil action for civil penalties against Big Ox Energy - Siouxland, LLC ("Big Ox") and NLC Energy Venture 30, LLC ("EV 30") (collectively "Defendants") for violations of Sections 110 and 112(r)(1) of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7410 and 7412(r)(1), and 309(b) and (d) of the Federal Water Pollution Control Act (commonly referred to as the "Clean Water Act" and hereinafter referred to as the "CWA"), 33 U.S.C. § 1319(b), (d), the Nebraska State Implementation Plan ("SIP"), and the Nebraska Environmental Protection Act ("NEPA"), Neb. Rev. Stat. §§ 81-1501 to 81-1532.

2.  The Complaint alleges that Defendants have violated the following environmental statutes, regulations, and permits applicable to Defendants' production of biogas and solids at its waste-to-energy facility in Dakota City, Nebraska:

   (a)  the CAA, 42 U.S.C. § 7412(r)(1), commonly known as the General Duty Clause;

   (b)  the CAA, 42 U.S.C. § 7410;

   (c)  the Nebraska SIP, 129 Neb. Admin. Code § 17-001 *et seq*.;

   (d)  the federally enforceable construction permits issued to Big Ox by NDEE (CP15-008 and CP17-033);

   (e)  the CWA, 33 U.S.C. §§ 1311, 1317, and 1342;

   (f)  NEPA, Neb. Rev. Stat. §§ 81-1506, 81-1508.02;

   (g)  the National Pollutant Discharge Elimination System ("NPDES") Industrial Storm Water General Permit NER910000; and

(h)     Sioux City NPDES Permit IA43095.

3.      During the period of time the Facility was operating, as defined in ¶ 10 below, EV 30, a Delaware limited liability company, and RRCK Holding, LLC, a Delaware limited liability company ("RRCK"), were the sole owners of NLC Energy—Big Ox LLC, a Delaware limited liability company ("NEBO"). NEBO, in turn was the ultimate parent company of Big Ox. However, Defendants have provided documentation reflecting that RRCK is no longer involved in the ownership or management of NEBO or Big Ox.

4.      The Complaint alleges that EV 30 assumed liability for Big Ox's violations of the environmental statutes, regulations, and permits described in Paragraphs 1 and 2 above.

## JURISDICTION, VENUE, AND NOTICE

5.      This Court has subject matter jurisdiction over this action and the parties pursuant to 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1331, 1345, and 1355. In addition, this Court has supplemental jurisdiction over the claims asserted by Nebraska pursuant to 28 U.S.C. §1367.

6.      Venue is proper in the District of Nebraska under 33 U.S.C. § 1319(b), 42 U.S.C. § 7413(b) and 28 U.S.C. §§ 1391(b) and 1395(a) because it is the judicial district in which the the Facility is located and the violations occurred at the Facility and were caused by the Defendants.

7.      Notice of the commencement of this action has been given to both the State of Nebraska pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and to the State of Iowa pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

- 3 -

**DEFENDANTS**

8.     Defendant Big Ox is a limited liability company organized and existing under the laws of the State of Wisconsin and is and/or was doing business in this judicial district at its waste-to-energy facility.

9.     Defendant EV 30 is a Delaware limited liability company and assumed the liabilities for Big Ox's violations of the environmental statutes, regulations, and permits described in Paragraphs 1 and 2 above, pursuant to an agreement dated July 31, 2020.

10.     Defendants own and operate a waste-to-energy facility located at 1616 D Avenue, Dakota City, Nebraska ("Facility").

11.     Defendants are "persons" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e), Section 502 of the CWA, 33 U.S.C. § 1362(5), and NEPA, Neb. Rev. Stat. § 81-1502(10).

**STATUTORY AND REGULATORY BACKGROUND**

**Clean Air Act: Accidental Release Prevention and General Duty Clause**

12.     The CAA establishes a regulatory scheme designed to protect and enhance the quality of the nation's air to promote the public health and welfare and the productive capacity of its populations. 42 U.S.C. § 7401(b)(1).

13.     In response to growing public concern and awareness of the threats posed by accidental releases of extremely hazardous substances, Congress amended the CAA in 1990 to include the accidental release provisions found in Section 112(r), 42 U.S.C. § 7412(r). The

objective of Section 112(r) of the CAA, 42 U.S.C. § 7412(r), is to prevent the accidental release of any listed and/or regulated substance or other extremely hazardous substance and to minimize the consequence of any such release.

14.     Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), commonly referred to as the General Duty Clause, is designed to impose a general duty on owners and operators to operate a safe facility, free of accidental releases that threaten life or property, by taking all feasible actions that are available to reduce hazards which are known to exist at the facility or which have been identified for similar facilities in the same industrial group. S. Rep. No. 228, 101st Cong., 1st Sess. 208 (1989).

15.     Specifically, Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), sets forth that owners and operators of stationary sources producing, processing, handling or storing substances listed pursuant to Section 112(r)(3), 42 U.S.C. § 7412(r)(3), or any other extremely hazardous substance, have a general duty in the same manner and the same extent as the Occupational Safety and Health Act, 29 U.S.C. § 654 *et seq.*, to identify hazards which may result from accidental releases using appropriate hazard assessment techniques, to design and maintain a safe facility, taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

16.     Pursuant to Section 112(r)(3), 42 U.S.C. § 7412(r)(3), EPA promulgated a list of regulated substances codified at 40 C.F.R. § 68.130.

17.     The term "regulated substance" means a substance listed under Section 112(r)(3). 42 U.S.C. § 7412(r)(2)(B).

- 5 -

18.     An "extremely hazardous substance" as used in Section 112(r)(1), is any chemical which may, as a result of short-term exposures because of releases to the air, cause death, injury, or property damage due to its toxicity, reactivity, flammability, volatility, or corrosivity. S. Rep. No. 228, 101st Cong., 1st Sess. 211 (1989). The term "extremely hazardous substance" includes, but is not limited to, regulatory substances listed by EPA at 40 C.F.R. § 68.130 pursuant to 42 U.S.C. § 7412(r)(3), and chemicals on the list of extremely hazardous substances published under Section 302 of Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11002, at 40 C.F.R. Part 355, Appendices A and B.

19.     Section 112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C), and the regulations at 40 C.F.R. § 68.3, define "stationary source" as any buildings, structures, equipment, installations or substance-emitting stationary activities which belong to the same industrial group, which are located on one or more contiguous properties, which are under the control of the same person (or persons under common control), and from which an accidental release may occur.

20.     Section 112(r)(2)(A) of the CAA, 42 U.S.C. § 7412(r)(2)(A), defines "accidental release" as an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

**Clean Air Act: State Implementation Plan and Construction Permit**

21.     Section 110 of the CAA, 42 U.S.C. § 7410, grants the Administrator of EPA authority to approve a SIP which provides for implementation, maintenance, and enforcement of an air quality standard in each air quality control region within the state.

22.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a SIP that provides for the attainment and maintenance of the National Ambient Air Quality Standards ("NAAQS").

23.     Section 161 of the CAA, 42 U.S.C. § 7471, requires SIPs to contain emissions limitations and other measures as may be necessary to prevent significant deterioration of air quality in attainment areas. The SIP requirements are set forth in 40 C.F.R. Part 51.

24.     Section 302(z) of the CAA, 42 U.S.C. § 7602(z), defines "stationary source" as any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in 42 U.S.C. § 7550.

### Nebraska Administrative Code

25.     Title 129 of the Nebraska Administrative Code is titled "Nebraska Air Quality Regulations" (Neb. Admin. Code) (Revised June 24, 2019).

26.     Included in Title 129 of the Nebraska Administrative Code is Chapter 17, titled "Construction Permits – When Required," which sets forth general construction permit applicability and requirements. 129 Neb. Admin. Code § 17-001 *et seq.* (Revised April 1, 2012).

27.     EPA most recent approval of Nebraska's SIP occurred on August 4, 2014, 129 Neb. Admin. Code § 17-001 *et seq.* Fed. Reg. 45,108 (Aug. 4, 2014).

28.     129 Neb. Admin. Code § 17-011 states, "Approval, by issuance of a permit for any construction, reconstruction, or modification, does not relieve the owner or operator from the responsibility to comply with the applicable portions of the Implementation Plan control

strategy. The permittee must comply with all conditions of the construction permit. Any permit noncompliance shall constitute a violation of the State Act and the Act, and is grounds for enforcement action or permit revocation."

29.     Nebraska's synthetic minor permit program is part of the federally approved SIP. *See* 129 Neb. Admin. Code § 5-001 *et seq.*; *see also* 81 Fed. Reg. 68,752 (Oct. 7, 2016).

30.     129 Neb. Admin. Code § 4-007 sets forth a limit for total reduced sulfur ("TRS"). The limit is set forth as follows:

> Total reduced sulfur
>
>> Level: 10.0 parts per million (10.0 ppm)
>> Averaging time: 1 minute
>> Form: Maximum average concentration
>>
>> Level: 0.10 parts per million (0.10 ppm)
>> Averaging time: 30-minutes
>> Form: Maximum rolling average.

31.     The TRS levels generally apply where human exposure occurs and must be measured in the manner set forth in the Code. 129 Neb. Admin. Code § 4-007 as part of the federally approved SIP. *See* 81 Fed. Reg. 70,023 (Oct. 11, 2016).

32.     129 Neb. Admin. Code § 35-001 *et seq.* requires sources to notify the NDEE of excess emissions due to startup, shutdown, and malfunction. 129 Neb. Admin. Code § 35-005 sets forth the reporting requirements for when a source has an event due to startup, shutdown, and/or malfunction.

33.     129 Neb. Admin. Code § 35-001 *et seq.* is part of the federally approved SIP. *See* 65 Fed. Reg. 3,130 (Jan. 20, 2000).

34.     129 Neb. Admin. Code § 32-001 sets forth the following visible emission limit: "No person may cause or permit the handling, transporting or storage of any material in a manner which may allow particulate matter to become airborne in such quantities and concentrations that it remains visible in the ambient air beyond the premises where it originates."

35.     129 Neb. Admin. Code § 32-001 *et seq.* is part of the federally approved SIP. *See* 60 Fed. Reg. 372 (Jan. 4, 1995).

36.     129 Neb. Admin. Code § 34-008 allows for the use of all credible evidence in enforcement actions. 129 Neb. Admin. Code § 34-008 is part of the federally approved SIP. *See* 81 Fed. Reg. 69,693 (Oct. 7, 2016); *see also* 62 Fed. Reg. 8,314 (Feb. 24, 1997).

### Clean Air Act: Enforcement Authorities

37.     Sections 113(a)(1) and (3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (3), authorize EPA to bring a civil action against any person who is in violation of any requirement or prohibition of Sections 110 or 112 of the CAA, including any New Source Performance Standard ("NSPS"), National Emissions Standards for Hazardous Air Pollutants ("NESHAP"), federal or state Title V requirements, permits, or other CAA requirements.

38.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

39.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA. This statutory maximum civil penalty has been increased to reflect inflation pursuant to the Debt Collection Improvement Act of 1996, 31

U.S.C. § 3701, as amended, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461, as amended, to $37,500 per day for each violation occurring after January 12, 2009, through November 2, 2015, and up to $102,638 per day for each violation occurring after November 2, 2015 and assessed after December 23, 2020. *See* 73 Fed. Reg. 75,340-75,346 (Dec. 11, 2008); 78 Fed. Reg. 66,643-66,648 (Nov. 6, 2013); 81 Fed. Reg. 43,091 (July 1, 2016); 82 Fed. Reg. 3,633 (Jan. 12, 2017), 83 Fed. Reg. 1,190-1,194 (Jan. 10, 2018); 85 Fed. Reg. 1,751 (Jan. 13, 2020), 85 Fed. Reg. 83,818 (Dec. 23, 2020), all codified at 40 C.F.R. Part 19.

### Clean Water Act

40.     The CWA, 33 U.S.C. § 1311(a), and implementing regulations, prohibit the discharge of pollutants into navigable waters of the United States by any person, except as in compliance with other sections of the Act, including Sections 307 and 402, 33 U.S.C. §§ 1317 and 1342, which govern activities subject to the Pretreatment Program and the issuance of NPDES permits.

41.     The CWA defines the term "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

42.     "Navigable waters" means the waters of the United States, including the territorial seas.

43.      "Source" means "any building, structure, facility, or installation from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3).

44.    "Pollutants" include "chemical wastes, biological materials . . . and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

45.    "Treatment works" is defined to include "any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature." 33 U.S.C. § 1292(2)(A).

46.    "Waters of the United States" has been defined to include, *inter alia*, all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, and tributaries of such waters. 40 C.F.R. § 122.2.

47.    Section 307 of the CWA establishes a statutory scheme for sources of pollutants that do not directly discharge into waters of the United States, but, rather, introduce pollutants into Publicly Owned Treatment Works ("POTW"), which in turn discharge pollutants into navigable waters. 33 U.S.C. § 1317.

48.    Section 307(b) of the CWA directs EPA to promulgate pretreatment standards "to prevent the discharge of any pollutant through treatment works . . . which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works." 33 U.S.C. § 1317(b).

### National Pretreatment Standards

49.    Under Section 307(b) of the CWA, 33 U.S.C. § 1317(b), EPA promulgated the National Pretreatment Standards, codified at 40 C.F.R. Part 403.

- 11 -

50.     "National Pretreatment Standard," "Pretreatment Standard," and "Standard" mean "any regulation containing pollutant discharge limits promulgated by the EPA in accordance with sections 307(b) and (c) of the Act, which applies to Industrial Users." 40 C.F.R. § 403.3(l).

51.     The National Pretreatment Standards establish general and specific prohibitions that "apply to each User introducing pollutants into a POTW whether or not the User is subject to other National Pretreatment Standards or any national, State, or local Pretreatment Requirements." 40 C.F.R. § 403.5(a)-(b).

52.      "Pretreatment" means "the reduction of the amount of pollutants, the elimination of pollutants, or the alteration of the nature of pollutant properties in wastewater prior to or in lieu of discharging or otherwise introducing such pollutants into a POTW. The reduction or alteration may be obtained by physical, chemical or biological processes, process changes or by other means…." 40 C.F.R. § 403.3(s).

53.     "User" and "Industrial User" mean "a source of Indirect Discharge." 40 C.F.R. § 403.3(j).

54.     "Indirect Discharge" and "Discharge" mean "the introduction of pollutants into a POTW from any non-domestic source regulated under section 307(b), (c) or (d) of the Act." 40 C.F.R. § 403.3(i).

55.      "POTW" means "a treatment works as defined by section 212 of the [CWA], which is owned by a State or municipality…."   40 C.F.R. § 403.3(q).

56.     Iowa Administrative Code defines a "Publicly Owned Treatment Works" or "POTW" as "any device or system used in the treatment of municipal sewage or industrial

wastes of a liquid nature which is owned by a municipal corporation or other public body created by or under Iowa law and having jurisdiction over disposal of sewage, industrial wastes or other wastes, or a designated and approved management agency under Section 208 of the Act." Iowa Admin. Code Section 567. Ch. 60.2.

57.     Industrial Users are subject to "local limits" established by a POTW, or by a state with an approved Pretreatment Program, to ensure the POTW's compliance with the terms of its NPDES permit. 40 C.F.R. §§ 403.5(c), 403.8(a), and 403.10(e).

58.     Under the general prohibitions in the National Pretreatment Standards, "a User may not introduce into a POTW any pollutant(s) which causes Pass Through or Interference." 40 C.F.R. § 403.5(a)(1).

59.     "Pass Through" means "a Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation)." 40 C.F.R. § 403.3(p).

60.     "Interference" means "a discharge which, alone or in conjunction with a discharge or discharges from other sources, both: (1) inhibits or disrupts the POTW, its treatment processes or operations, or its sludge processes, use or disposal; and (2) therefore is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation)...." 40 C.F.R. § 403.3(k).

61.     POTWs are required to develop and enforce specific effluent limits for industrial users in cases where pollutants contributed to the POTW by such users result in recurring interference and/or pass through at the POTW. 40 C.F.R. § 403.5(c)(2).

62.     40 C.F.R. § 403.5(b)(4) states that a User also shall not introduce into a POTW "[a]ny pollutant, including oxygen demanding pollutants (BOD, etc.) released in a Discharge at a flow rate and/or pollutant concentration which will cause Interference with the POTW."

63.     40 C.F.R. § 403.12(f) requires Industrial Users to notify the POTW immediately of all "discharges that could cause problems to the POTW, including any slug loadings," as defined by § 403.5(b).

64.     Effluent limitations, as defined in 33 U.S.C. § 1362(11), are restrictions on the quantity, rate, and concentration of chemical, physical, biological and other constituents of wastewater discharges into navigable waters of the United States.

65.     Numeric effluent limitations, as well as narrative conditions, are among the conditions and limitations prescribed in NPDES permits issued under 33 U.S.C. § 1342.

66.     Upon receiving authorization and approval under Section 402(b) of the CWA, 33 U.S.C. § 1342(b), a state may establish its own Pretreatment Program and thereby assume responsibility for implementing the POTW Pretreatment Program requirements set forth in 40 C.F.R. § 403.8(f). 40 C.F.R. § 403.10(e).

67.     On August 10, 1978, EPA approved the State of Iowa's NPDES Program pursuant to a Memorandum of Agreement ("MOA")[1]. Iowa's Pretreatment Program was approved on June 3, 1981. On March 10, 2016, the parties entered into a MOA between the Iowa Department of Natural Resources and the EPA to address the administration of the NPDES and Pretreatment Program that replaced the original 1978 MOA.

68.     In states authorized to implement their own Pretreatment Programs, EPA retains authority, concurrent with the state, to enforce the state Pretreatment Program permits. 33 U.S.C. §§ 1319, and 1342(i).

69.     Local limits established by a POTW, or by a state with an approved Pretreatment Program, are considered to be "Pretreatment Standards" for the purposes of Section 307(d) of the CWA. 33 U.S.C. § 1317(d); 40 C.F.R. § 403.5(d).

**Clean Water Act: Enforcement Authorities**

70.     EPA may commence a civil action for appropriate relief whenever it finds that a source has discharged pollutants to a POTW in violation of applicable pretreatment standards. 33 U.S.C. § 1319(b).

71.     Under Sections 309(b) and (d) of the CWA, any owner or operator of a source who operates that source in violation of any effluent standard or prohibition or pretreatment standard promulgated under Section 307 of the CWA, 33 U.S.C. § 1317, is liable for injunctive relief and civil penalties, not to exceed $25,000 per day for each violation. 33 U.S.C. § 1319(b),

---

[1] https://www.epa.gov/sites/production/files/2013-09/documents/ia-moa-npdes.pdf

(d).  This statutory maximum  civil penalty has been increased to reflect inflation  pursuant to the

Debt Collection  Improvement  Act of 1996, 31 U.S.C. § 3701,  as amended, and the Federal Civil

Penalties Inflation  Adjustment  Act Improvements  Act of 2015 (28 U.S.C. § 2461),  as amended,

to $37,500  per day for each violation  occurring  after January 12, 2009,  through  November 2,

2015,  and up to $56,460  per day for each violation  occurring  after November 2, 2015 and

assessed after December 23, 2020. *See* 73 Fed. Reg. 75,340-75,346  (Dec. 11, 2008); 78 Fed.

Reg. 66,643-66,648  (Nov. 6, 2013); 81 Fed. Reg. 43,091  (July 1, 2016); 82 Fed. Reg. 3,633  (Jan.

12, 2017), 83 Fed. Reg. 1,190-1194  (Jan. 10, 2018); 85 Fed. Reg. 1.751 (Jan. 13, 2020), 85 Fed.

Reg. 83,818  (Dec. 23, 2020), all codified  at 40 C.F.R. Part 19.

## Nebraska Environmental Protection Act

72.      Under NEPA, NDEE has been charged with the duty to exercise exclusive  general

supervision  of the administration  of and enforcement of the CAA, CWA, the Integrated Solid

Waste Management Act, Neb. Rev. Stat. §§ 13-2001  *et seq*., and all permits, rules and

regulations  and orders promulgated  under the Acts.

73.      As part of its duties under NEPA, NDEE has authority to "issue, continue  in

effect, revoke, modify,  or deny permits … (a) to prevent, control,  or abate pollution,  (b) for the

discharge of wastes into the air, land, or waters of the state, and (c) for the installation,

modification,  or operation  of disposal  systems or any parts thereof[.]" Neb. Rev. Stat. § 81-

1504(11).

74.     NDEE also has authority, delegated by EPA, to administer the CWA Section 402 NPDES permit program, which includes issuance of permits under that program. *See, e.g.*, Neb. Rev. Stat. § 81-1505(11).

75.     As set forth in NDEE's rules and regulations, "[a]ll persons discharging or proposing to discharge pollutants from a point source into any waters of the state are required to apply for and have a permit to discharge as required by 40 C.F.R. § 122.21(a)[,]" which includes discharges of storm water associated with industrial activities. 119 Neb. Admin. Code § 2-002; *see id*. § 3-001 (listing some discharges exempt from the NPDES permit requirement).

76.     NEPA makes it unlawful for any person to:

A.     "[V]iolate any … permit or license condition or limitation, any order of the director, or any monitoring, reporting, or record-keeping requirements contained in or issued or entered into pursuant to … [NEPA] … or the rules or regulations adopted and promulgated pursuant to such acts[;]" or

B.     "Discharge any pollutant into waters of the state without obtaining a permit as required by the [NPDES] created by the [CWA], as amended, 33 U.S.C. 1251 et seq., and by rules and regulations adopted and promulgated pursuant to section 81-1505[.]" Neb. Rev. Stat. §§ 81-1508.02(1)(1)(b), 81-1506(2)(a).

77.     More specifically, NDEE's rules and regulations provide: "No person shall discharge storm water containing any pollutant except as authorized by an NPDES permit or this Chapter." 119 Neb. Admin. Code § 10-002.

- 17 -

78.     "Person" means any "[i]ndividual; partnership; limited liability company; association; public or private corporation; trustee; receiver; assignee; agent; municipality or other governmental subdivision; public agency; other legal entity; or any officer or governing or managing body of any public or private corporation, municipality, governmental subdivision, public agency, or other legal entity[.]" Neb. Rev. Stat. § 81-1502(10).

79.     "Waters of the state" means "all waters within the jurisdiction of this state, including all streams, lakes, ponds, impounding reservoirs, marshes, wetlands, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and all other bodies or accumulations of water, surface or underground, natural or artificial, public or private, situated wholly or partly within or bordering upon the state[.]" Neb. Rev. Stat. § 81-1502(21).

80.     "'Discharge', when used without qualification, means accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of pollutants into any waters of the State or in a place which will likely reach waters of the State." 119 Neb. Admin. Code § 1-038.

81.     "Discharge of a pollutant" and "discharge of pollutants" mean "any addition of any pollutant or combination of pollutants to waters of the state from any point source. This includes discharge into waters of the state from surface runoff which is collected or channeled by man; discharges through pipes, sewers, or other conveyances owned by a state, municipality or other party which do not lead to treatment systems; and discharges through pipes, sewers, or other conveyances, leading into treatment systems owned in whole or in part by a third party other than a state or municipality." 119 Neb. Admin. Code § 1-040.

- 18 -

82.     "Pollutant" means "dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials (except those regulated under the Atomic Energy Act of 1954 as amended, 42 U.S.C. 2011 et seq.), heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 119 Neb. Admin. Code § 1-087.

83.     "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture or agricultural storm water runoff." 119 Neb. Admin. Code § 1-086.

84.     "Storm water" means "storm water runoff, snow melt runoff, and surface runoff and drainage." 119 Neb. Admin. Code § 1-112; *see also id*. § 1-113 (defining "storm water discharge associated with industrial activity").

85.     Violations of NEPA are subject to civil penalties of $10,000 per day, with each day of a continuing violation constituting a separate violation.   Neb. Rev. Stat. § 81-1508.02(2).

## GENERAL ALLEGATIONS

86.     Defendants owned and operated the Facility that processed food waste, high strength waste, and industrial and residential wastewater in a conventional mesophilic anaerobic digester system.  Starting on or about September 2, 2016, Defendants began accepting waste for

treatment.  The Facility  consisted of two rectangular shaped digesters containing  five mixers placed equidistant  within  each digester.

87.     At all times  relevant  to this Complaint,  Defendants  were  "owners or operators" of the Facility  located at 1616 D Street, Dakota City,  Nebraska that is the subject of this action within  the meaning  of Section  112(a)(9) of CAA, 42 U.S.C. § 7412(a)(9), and 129 Neb. Admin. Code § 1-097 (68 Fed. Reg. 40,528  (July 8, 2003)).

88.     At all times  relevant  to this Complaint, the Facility  was a "stationary source" as defined by Section  112(r)(2)(C) of the CAA, 42 U.S.C. § 7412(r)(2)(C).

89.     At all times  relevant  to Complaint,  the Facility  was subject to the General Duty Clause of Section  112(r)(1) because it was a "stationary source" that produced,  processed, handled,  and/or stored one or more regulated substances listed under Section  112(c)(3) of the CAA, 42 U.S.C. § 7412(r)(3), and/or one or more "extremely hazardous  substances" within  the meaning of Section  112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

90.     From approximately  September 2016, through May 2019, the Facility  used two digesters to combine  food waste, high strength waste, and thickened solids  from the sanitary sewer.  The volatile  fraction of the solids  is bio-digested  and converted to carbon dioxide  ($CO_2$), methane ($CH_4$) and other gases such as hydrogen sulfide  ($H_2S$).  The combination  of gases generated by the digester is termed "biogas."

91.     The Facility  used two processes that produce, process, handle, and/or store biogas,  $CH_4$, and $H_2S$: (1) an enclosed,  anaerobic biodigester  system consisting  of two digesters

that process food waste, biomass waste streams to produce a biogas intermediate that contains $CH_4$; and (2) a gas clean-up skid to produce a compressed natural gas that is sold as a fuel.

92.     During normal operations, at any one time, the Facility had approximately 6,200 pounds of biogas ($CH_4$, $CO_2$, and $H_2S$) mixture onsite. The Facility was also equipped with an odor media scrubber for $H_2S$ removal from various onsite sources and a flare which was used for gas combustion during times of malfunction.

93.     The digested solids are removed from the digester after an approximate 15-day residence time and dewatered by screw presses followed by centrifuges and then hauled offsite for either land application or landfilling.

94.     At all times relevant to this Complaint, the Facility, during normal operations, was capable of producing as much as 1,314 million standard cubic feet of biogas per year.

95.     Through a CAA Section 114 information request, on December 22, 2016, and a facility inspection, on February 13-15, 2017, EPA determined that the Facility handled biogas which contains $CH_4$, $CO_2$, and $H_2S$ in quantities described below.

96.     Biogas is a flammable mixture containing more than 1% $CH_4$, a flammable substance listed at 40 C.F.R. § 68.130, Table 3. Big Ox's CAA Permit application stated that the biogas produced at the Facility consists of 68% $CH_4$, 32% $CO_2$, 0.03% $H_2S$, and other trace gases.

97.     $CH_4$ is a colorless odorless gas. It is easily ignited. The vapors are lighter than air. Under prolonged exposure to fire or intense heat, containers of $CH_4$ may rupture violently and rocket. It is used in making other chemicals and as a constituent of the fuel, natural gas. It

has a lower explosive limit ("LEL") of 5.0%. $CH_4$ is a flammable substance listed at 40 C.F.R. § 68.130, with a National Fire Protection Association 704 classification of 4 (the highest possible classification) substance that burns readily and rapidly or completely vaporizes at atmospheric pressure and normal ambient temperature and an explosive range of 5% to 15% in air.

98.      $H_2S$ is a colorless gas having a strong odor of rotten eggs that is very toxic by inhalation. $H_2S$ fatigues the sense of smell, which cannot be counted on to warn of the continued presence of the gas. Prolonged exposure of closed containers to heat may result in their violent rupturing and rocketing. It has an LEL of 4.3%. Based on the National Institute for Occupational Safety and Health, the level at which it is immediately dangerous to life and health ("IDLH") is 100 ppm. $H_2S$ is a toxic substance listed at 40 C.F.R. § 68.130 with a National Fire Protection Association 704 classification of 4 (the highest possible classification) for both toxicity and flammability. Exposure to very high concentrations of $H_2S$ causes immediate death. Death or permanent injury may occur after a very short exposure to small quantities. It acts directly upon the nervous system resulting in paralysis of respiratory centers.

99.      At all times relevant to this Complaint, the biogas produced in the digesters was scrubbed of $CO_2$ and other gases in the biogas clean-up skid, then compressed and delivered to a natural gas pipeline as $CH_4$.

100.      At all times relevant to this Complaint, the Facility also received waste from several industries by semi-truck. The semi-trucks delivered the waste to the Facility into the receiving bay area and deposited the waste into a pit.

101.    At all times relevant to this Complaint, the waste delivered to the Facility by semi-truck occasionally contained high levels of $H_2S$ and $CH_4$.

102.    At all times relevant to this Complaint, employees were required to wear personal four-gas monitors for detection of $CH_4$ and $H_2S$.

103.    Four-gas personal monitors are small air monitoring devices worn on the body to notify the person wearing the monitor of the levels of $H_2S$, $CH_4$, oxygen, and carbon monoxide in the air. At the Facility, these monitors helped employees determine when self-contained breathing apparatus were needed to safely unload semi-trucks that were off-gassing $H_2S$.

104.    At the Facility, four-gas personal monitors also helped employees determine the risk of fire and explosion and take preventative action to reduce such risks. The monitors read percentage (%) of LEL. CAMEO Chemicals[2] provides that $CH_4$ is easily ignited. CAMEO Chemicals states that in the case of a $CH_4$ spill, eliminate all ignition sources (no smoking, flares, sparks or flames in immediate area), and isolate the area until the gas has dispersed.

105.    At all times relevant to this Complaint, the receiving area was equipped with two stationary monitors that recorded the concentration levels of $CH_4$ and $H_2S$ because the receiving areas contained high levels of $CH_4$ and $H_2S$ from the trucked in waste material delivered to the Facility for processing.

---

[2] https://cameochemicals.noaa.gov/

106.    Pursuant to the OSHA requirements for testing flammable vapors or gases in 29 C.F.R. § 1915.12(b)(3), Big Ox used 10% of LEL as the personal monitor and stationary alarm values for four-gas personal and $CH_4$ and $H_2S$ stationary monitors.

107.    NDEE issued two CAA construction permits to the Facility. Construction Permit CP15-008 was issued on April 5, 2016. Construction Permit CP17-033 was issued on April 9, 2018. CP17-033 supersedes permit CP15-008. Both permits were issued pursuant to 129 Neb. Admin. Code § 17-001 *et seq*.

108.    At all times relevant to this Complaint, Defendants accepted industrial wastewater for treatment at the Facility.

109.    On or about, May 1, 2016, Sioux City, Iowa issued a Pretreatment permit to Big Ox that was effective on May 1, 2016. The permit was amended January 31, 2017, after Sioux City determined that Big Ox was not subject to Categorical Pretreatment Standards.

110.    On or about November 25, 2018, the City of Sioux City, Iowa, re-issued the Pretreatment permit to Big Ox with an expiration date of April 30, 2019. The permit included specific interim and final pollutant limits for total suspended solids ("TSS"), and monitoring requirements for biological oxygen demand ("BOD"), fats, oils, and grease ("FOG"), total nitrogen and total phosphorous.

111.    At all times relevant to this Complaint, Defendants were an "Industrial User" of the Sioux City, Iowa POTW as defined by 33 U.S.C. § 1362(18); 40 C.F.R. § 403.3(j), discharging non-domestic "pollutants" as defined at 33 U.S.C. § 1362(6) into the Sioux City POTW.

- 24 -

112.    Defendants were a "Significant  Industrial  User," as defined  by 40 C.F.R. § 403.3(v).

113.    At all times  relevant  to this Complaint,  the Sioux  City POTW consisted  of a sewage collection  system and a wastewater treatment plant that provides  primary  treatment followed  by an activated  sludge  process with secondary clarification.   Solids  removed  during primary and secondary treatment are anaerobically  digested.

114.    At all times  relevant  to this Complaint,  the Sioux  City POTW received  and treated wastewater from domestic  and industrial  sources, including  the Facility.

115.    At all times  relevant  to this Complaint,  the Facility  introduced  wastewater from its permitted outfall,  Outfall  001, into the Sioux  City POTW.

116.    At all times  relevant  to this Complaint,  the Sioux  City  wastewater treatment plant and collection  system was a "POTW" within  the meaning  of 40 C.F.R. § 403.3(q) and Iowa Admin.  Code Ch. 567 § 60.2 and a "treatment  works"  within  the meaning  of Section  212 of the CWA, 33 U.S.C. § 1292(2)(A).

117.    At all times  relevant  to this Complaint,  the Sioux  City POTW was authorized  to discharge wastewater pursuant  to its NPDES Permit  IA0043095,  issued by Iowa Department  of Natural  Resources  on April 1, 2015.

118.    At all times  relevant  to this Complaint,  NPDES Permit  IA0043095  limited  the Sioux  City POTW's plant capacity  to 87,208  lbs./day five-day BOD.

119.    At all times  relevant  to this Complaint,  NPDES Permit  IA0043095  limited  the Sioux  City's  POTW plant capacity  to 69,676  lbs./day TSS.

- 25 -

120.    At all times relevant to this Complaint, NPDES Permit IA0043095 limited Sioux City's POTW plant capacity to 12,338 lbs./day total Kjeldahl nitrogen (TKN).

121.    At all times relevant to this Complaint, the Sioux City POTW was prohibited from discharging effluent containing TSS in excess of 45 milligrams per liter (mg/l) for a 7-day average and 30 mg/l for a 30-day average.

122.    At all times relevant to this Complaint, the Sioux City POTW was not permitted to discharge effluent containing $BOD_5$ in excess of 40 mg/l for a 7-day average and 25 mg/l for a 30-day average.

123.    At all times relevant to this Complaint, the Sioux City POTW's NPDES Permit IA0043095 contained limits for ammonia that varied by month. The Daily Maximum ammonia concentration for April was 55.7 mg/l, while the Daily Maximum ammonia concentration for May was 55 mg/l.

124.    At all times relevant to this Complaint, the Sioux City POTW discharged to the Missouri River, which is a traditionally navigable water and a Water of the United States.

125.    At all times relevant to this Complaint, the wastewater that the Sioux City POTW discharged in to the Missouri River contained "pollutants," as defined by Section 502(6) of the CWA, 33 U.S.C. § 1362(6), including BOD, TSS, and/or ammonia, among other pollutants.

126.    At all times relevant to this Complaint, the Sioux City POTW "discharged pollutants" through a "point source" to "navigable waters" as those terms are defined by Sections 502(12), (14), and (7) of the CWA, 33 U.S.C. §§ 1362(12), (14), and (7).

127.    At all times relevant to this Complaint, the Facility's wastewater contained "pollutants," as defined by Section 502(6) of the CWA, 33 U.S.C. § 1362(6), including, but not limited to, BOD, TSS and TKN.

128.    At all times relevant to this Complaint, Defendants "discharged" pollutants into the Sioux City POTW within the meaning of 40 C.F.R. § 403.3(i).

129.    NDEE issued NPDES Authorization NE910002 to Big Ox on July 26, 2016, to allow discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

130.    At all times relevant to this Complaint, the Facility was subject to the terms and conditions of its NPDES Industrial Storm Water General Permit NER910000.  The terms and conditions of NPDES Industrial Storm Water General Permit NER910000 include, *inter alia*, prohibitions on discharges mixed with non-storm water, reporting requirements for noncompliance, non-numeric effluent limits, and listing of and implementation of control measures for potential pollutant sources.

131.    NPDES Industrial Storm Water General Permit NER910000 required Defendants to have a Storm Water Pollution Prevention Plan ("SWPPP") in place for permit coverage that must contain prescribed elements, such as potential pollutant sources and control measures.

132.    The Facility's SWPPP was originally created in June 2016 and revised in March 2017.  The Facility rewrote this SWPPP in February 2019 and revised it in September 2019 and December 2019.

133.     Beginning in December 2017, the Facility began releasing liquid biomass from its digesters, through its air emission points, over the sides of its roof, and onto the property. In some cases, the released liquid biomass mixed with storm water and ran off the property to waters of the state, as defined in Neb. Rev. Stat. § 81-1502(21).

134.     The liquid biomass is a "pollutant," as defined in 119 Neb. Admin. Code § 1-087.

135.     The liquid biomass is not listed as an allowable non-storm water discharge in the Facility's NPDES Industrial Storm Water General Permit NER910000.

136.     On December 4, 2017, EPA and Big Ox entered into a Consent Agreement and Final Order to address violations of Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(7). *See* CAA07-2017-0453.

137.     NDEE began conducting compliance inspections at the Facility on February 13, 2017. NDEE inspected the Facility over 20 times between February 2017 and February 2019.

138.     Defendants released liquid biomass on at least 32 occasions between December 2017 and January 2019.

139.     During at least 16 of these 32 occasions, the liquid biomass released from the digesters went over the side(s) of the roof and onto the ground where it mixed with storm water and resulted in discharges of non-storm water off the property and to waters of the state.

140.     Following a large release of liquid biomass event in May 2018, EPA, at the request of NDEE, conducted air monitoring in June 2018, using the Geospatial Mapping Air Pollution Tool ("GMAP"). The GMAP is a vehicle that contains monitoring equipment capable

of real-time air monitoring for $CH_4$, $H_2S$, and volatile organic compounds. The GMAP monitoring found elevated levels of $H_2S$ and $CH_4$ around the facility.

141.    On or about July 3, 2018, and August 6, 2018, EPA issued information requests to the Facility pursuant to Section 114 of the CAA, 42 U.S.C. § 7414. EPA requested information related to the digester overflow events. EPA also required installation of air monitors to determine compliance with the SIP and whether the elevated levels of biogas were causing or contributing to worker safety and health issues.

142.    On July 26, 2018, NDEE conducted a site visit of the Facility. During the inspection, NDEE identified several problems with the centrifuges used to dewater sludge from the digesters. NDEE learned the centrifuges had been out of service for months.

143.    During the outage of the centrifuges, a screw press was used to dewater the sludge. The screw press did not have as much capacity to dewater the sludge as the centrifuges. Therefore, more solids passed through to the gas energy mixing unit, impacting its performance.

144.    There was also solids buildup in the corners of the digesters because they were square, not round. The solids buildup in the corners of the digesters reduced the capacity of the tanks.

145.    In addition, the temperature through the tanks were not uniform, and the tanks' contents near the outlet of the tank were warmer than the inlet to the tanks.

146.    On or about September 10, 11, and 14, 2018, EPA conducted a storm water inspection of the Facility pursuant to the CWA, 33 U.S.C. § 1318. The inspector issued a Notice of Potential Violation ("NOPV") with twenty observations.

147.     On or about September 19, 2018, EPA entered into an Administrative Compliance Order on Consent ("ACOC") with Big Ox to address violations of the state-issued construction permits pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, and safety issues pursuant to the General Duty Clause, Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).  To date, Big Ox has not fully complied with the terms of this ACOC.

148.     On or about November 13 and 14, 2018, EPA conducted a General Duty Clause inspection pursuant to Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).  The inspector left a NOPV at the Facility which stated that the Facility had failed to design and maintain a safe facility.

149.     On or about December 2018, the City of Sioux City referred the violations of Big Ox's pretreatment permit to EPA for enforcement.

150.     On or about December 20, 2018, EPA issued an information request letter pursuant to Section 308 of the CWA, 33 U.S.C. § 1318, to the City of Sioux City, Iowa.

151.     On January 2, 2019, NDEE conducted a site visit at the Facility and observed digester solids being stockpiled on site, track out of industrial wastes or materials by vehicles used at the Facility, and a lack of containment and other control measures for the piles of digester solids and other pollutants.

152.     NDEE conducted additional site visits and made the same or similar observations as those made during the January 2, 2019, inspection.

153.     Beginning in approximately December 2018 and ending in approximately June 2019, Big Ox stockpiled digester solids at the Facility.

154.    On February 8, 2019, EPA issued Big Ox a Notice of Violation ("NOV") pursuant to Section 113 of the CAA, 42 U.S.C. § 7413, which stated that the unpermitted flare bypass was a violation of Big Ox's state-issued construction permit CP17-033.

155.    On February 12, 2019, EPA issued a Unilateral Administrative Order ("UAO") pursuant to Section 113(a)(3), CAA, § 42 U.S.C. § 7413(a)(3) for violations of Section 112 of the CAA, 42 U.S.C. § 7412, to Big Ox to address the worker health and safety issues related to the use of the flare bypass. Big Ox completed the flare bypass required by the UAO and entered into a separate order with NDEE to amend its air construction permit. NDEE, however, took no action on the revised permit application from Big Ox because the air permits were revoked and the Facility was no longer operating.

156.    NDEE issued five NOVs between approximately February 2017 and February 2019 for violations of the Nebraska air quality and water quality regulations and state-issued air and storm water permits.

157.    On March 22, 2019, NDEE issued an Order to Show Cause requiring Big Ox to present evidence showing why Air Quality Construction Permit CP17-033 and storm water permit NPDES General Permit NER91000, NPDES Authorization Number NER91002, should not be revoked. On January 21, 2020, both permits were revoked by NDEE.

158.    The City of Sioux City issued thirteen NOVs and one Cease and Desist Order to Big Ox between approximately February 2017 and February 2019 for unpermitted discharges and exceedances of the pretreatment permit. The total penalties included in these thirteen NOVs totaled approximately $68,500.

159.     On April 30, 2019, the City of Sioux City refused to renew Big Ox's permits due to outstanding compliance issues and failure to pay the penalties and surcharges associated with Big Ox's noncompliance.

160.     Defendants cannot accept waste materials because the Facility no longer has CAA construction permits or an NPDES storm water permit, which were revoked as of January 21, 2020.

### CAA Section 112(r)(1) General Duty Clause Violations

### FIRST CLAIM FOR RELIEF
### Failure to Design and Maintain a Safe Facility through Improper Process of Handling Extremely Hazardous Substances Which May Result in an Accidental Release or Explosion

161.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

162.     Under Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), at all times relevant to this Complaint, Defendants had a duty to, in the same manner and to the same extent as 29 U.S.C. § 654 (Occupational Health and Safety Act), design and maintain the Facility as a safe facility taking such steps as were necessary to prevent a release of a regulated substance or extremely hazardous substance from the Facility.

163.     Biogas, $CH_4$, and $H_2S$ are "extremely hazardous substances" within the meaning of Section 112(r) of the CAA, 42 U.S.C. § 7412(r).

164.     On June 28, 2018, NDEE and EPA conducted air monitoring around the Facility using the GMAP. The maximum measured $H_2S$ concentration was 1087 ppb and the maximum measured $CH_4$ concentration was 199 ppm.

165.    Personal monitoring data of employees provided by Big Ox showed that employees were being exposed to dangerous levels of $H_2S$ and $CH_4$.

166.    The personal alarm information provided by Big Ox showed 12,084 $H_2S$ exposure alarms from approximately January 2018 through June 2018.

167.    The personal alarm information provided by Big Ox showed 602 $CH_4$ exposure alarms from approximately January 2018 to June 2018.

168.    The detection of biogas, composed of $CH_4$ and $H_2S$, from these personal alarms indicates that Defendants were having accidental releases from process equipment at the Facility.

169.    Defendants utilized self-contained breathing apparatus as the only safeguard for the protection of workers from exposure to biogas, during normal operations and when conducting maintenance activities.

170.    Big Ox provided 2018 design documents for the facility. In those documents, Big Ox listed the following recognized and generally accepted good engineering practices ("RAGAGEP") as applicable to the Facility: South Sioux City Municipal Code, the 2006 International Building Code, the 2006 International Mechanical Code, the 2014 National Electric Code, the 2006 Uniform Plumbing Code, the 2006 Internal Energy Conservation Code, the 2010 Americans with Disabilities Act, the 2000 NFPA 101 Life Safety Code (with amendments) and the 2006 International Fuel Gas Code.

171.    The 2000 NFPA 101 Life Safety Code (with amendments) states in Section 4.5.1, "The design of every building or structure intended for human occupancy shall be such that reliance for safety to life does not depend solely on any single safeguard. An additional

safeguard(s) shall be provided for life safety in case any single safeguard is rendered ineffective."

172.    Defendants failed to maintain the facility to prevent accidental releases by failing to: control the type and amount of material put into the digesters, closing open digester hatches, repairing holes in digester hatches, and repairing the expansion joint in the digester.

173.    Defendants could have prevented these releases by building the Facility in accordance with the RAGAGEP for anaerobic digester mixers.

174.    From approximately June 2017 to May 2019, Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), every day that it failed to design and maintain a safe facility and failed to take such steps as necessary to prevent accidental releases of biogas composed of $H_2S$ and $CH_4$ or explosion.

175.    As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

## SECOND CLAIM FOR RELIEF
### Improper Maintenance of Digesters Which May Result in Accidental Release or Explosion of Extremely Hazardous Substances

176.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

177.    From at least May 29, 2018 through January 25, 2019, liquid biomass, which contained biogas, overflowed, spilled, and leaked from the digesters on multiple occasions, releasing extremely hazardous substances into the environment.

178.    On or about June 8, 2018, Big Ox submitted a Malfunction Exception Report to NDEE stating that on or about May 29-30, 2018, approximately 80,000 gallons of liquid biomass, which contained biogas, overflowed from the digesters. When the biomass overflowed, biogas, an extremely hazardous substance, was released to the environment.

179.    On June 14, 2018, NDEE verified the discharge and estimated that approximately 200,000 to 400,000 gallons of liquid biomass had been discharged from the Facility from May 29, 2019, to the date of the inspection.

180.    On June 19 and 20, 2018, the City of Sioux City, Iowa, and NDEE issued NOVs for failure to report these releases.

181.    On June 22, 2018, NDEE observed a continuing discharge and issued an emergency order to Big Ox on June 25, 2018 to address the discharge. On June 22, 2018, Big Ox notified NDEE of additional spills, including a June 8 to 9, 2018, overflow event that included approximately 500,000 gallons of liquid biomass which contained biogas. Biogas, an extremely hazardous substance, was released into the air during these spills.

182.    On July 26, 2018, NDEE identified additional problems with the roof of the digesters, including an out of service mixer 1 on digester 1 and improper positioning of mixers that hindered repair or replacement.

183.    On July 26, 2018, NDEE also identified a leak on the roof of digester 2 and that the pH and temperature probes were not functioning and needed to be replaced. A Big Ox employee measured $H_2S$ of 62 ppm being emitted through the leak on the roof of digester 2, with a four-gas personal monitor.

184.    Big Ox's own maintenance logs indicated that Big Ox failed to inspect, maintain, and repair the mixers at least 58 times from approximately June 2017, to August 2018.

185.    As a result of Big Ox's failure to inspect, maintain, and repair the mixers, mixer 2 began leaking biogas in approximately February 2018 and mixer 3 began leaking biogas in approximately April 2018.  Beginning in May 1 2018, mixers 2, 3, and 4 were out of service, mixer 1 was removed, which left only mixer 5 in service although it was in need of repair and maintenance.  Repair and maintenance of all five mixers was completed by October 2018.  As a result, the digesters did not operate as designed, material accumulated inside of the digesters, and the digesters had reduced capacity.

186.    Another large release of liquid biomass occurred at the Facility on January 25, 2019.  Big Ox notified NDEE that approximately 60,000 to 80,000 gallons of digester material (including both liquid biomass and other solids) overflowed the building onto the adjacent property.  Biogas, an extremely hazardous substance, was released into the air during these releases.

187.    Based on information available to the anaerobic biodigester industry at the time, including but not limited to articles in several industry journals, digester overflow was a recognized hazard of operation of anaerobic digesters that can be controlled by proper maintenance and operational controls.

188.    Defendants' failure to follow proper standard operating procedures related to equipment malfunction and failure, and hydraulic overload led to liquid biomass overflow events.

189.     As a result of its failure to design and maintain a safe facility by following proper standard operating procedures, from approximately December 18, 2017 to January 25, 2019, Defendants released to the environment more than 4.4 million gallons of liquid and 1.27 million pounds of solids, which is 1.4 times the capacity of the two anaerobic digesters. The liquid and solids contained extremely hazardous substances, which were released to the environment.

190.     From approximately June 2017 to May 2019, Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), each day that it failed to design and maintain a safe facility, and failed to take such steps as necessary to prevent accidental releases or explosion.

191.     As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

## THIRD CLAIM FOR RELIEF
### Failure to Properly Design the Receiving Bay Area Which May Result in Accidental Releases or Explosion of Extremely Hazardous Substances

192.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

193.     The receiving bay at the Facility receives feed stocks from semi-trucks that contain and off-gas high levels of $H_2S$.

194.     As part of the August 8, 2018, CAA Section 114 Information Request, EPA required Big Ox to install, use and maintain monitoring equipment capable of detecting $H_2S$ and $CH_4$ in and around the following areas:

(a)     east end of the receiving area;

- 37 -

(b)      the west end of the receiving area;

(c)      hatches on the roof;

(d)      pressure relief valves ("PRVs") on the roof;

(e)      the northwest boundary of the Facility;

(f)      southeast boundary line of the Facility; and

(g)      northeast boundary line of the Facility.

195.    From approximately October 2018 through January 2019, the monitor located at the east end of the receiving area showed 135 readings of $H_2S$ above IDLH of 100 ppm.

196.    In its design submitted as part of the permit applications, Big Ox lists the 2006 International Mechanical Code ("IMC") as an applicable code. Section 510 of the IMC covers hazardous exhaust systems designed to capture and control hazardous emissions generated from product handling or processes and convey those emissions to the outdoors. Section 510 includes the requirement to install a hazardous exhaust system when operations involving the handling or processing of hazardous materials, in the absence of such exhaust systems and under normal operating conditions, have the potential to create a vapor, gas, fume, mist or dust with a health-hazard rating of 4 is present in any concentration. $H_2S$ has a health-hazard rating of 4.

197.    The IMC also states that an exhaust system is required wherever handling or processing hazardous materials have the potential to create a flammable vapor, gas, fume, mist or dust is present in concentrations exceeding 25 percent of the lower flammability limit of the substance for the expected room temperature; a vapor, gas, fume, mist or dust with a health-hazard rating of 4 is present in any concentration; or a vapor, gas, fume, mist or dust with a

health-hazard rating of 1, 2 or 3 is present in concentrations exceeding 1 percent of the median lethal concentration of the substance for acute inhalation toxicity.

198.     The monitoring data provided by Big Ox demonstrates that concentrations of $H_2S$ have exceeded IDLH in the Facility's receiving bay on 11 occasions from approximately October 2018 to December 2018.

199.     The design drawings for the Facility also show a plan to install an odor control scrubber. An odor control scrubber would function as an exhaust system in the receiving bay area. During the November 13-14, 2018, EPA inspection, Big Ox verified that the odor control scrubber was not hooked up to the receiving bay ventilation system.

200.     The Facility received materials by semi-truck. When these trucks unloaded, the materials off-gassed $H_2S$ that was not captured by the ventilation system and was released into ambient air inside and outside of the building.

201.     The receiving pit had a cover that was occasionally closed. During multiple EPA and NDEE inspections, inspectors observed that the receiving pit cover was not closed. When the cover was not closed, the receiving pit off-gassed $H_2S$ that was not captured by the ventilation system and was released into ambient air inside and outside of the building.

202.     The CAA permit and design documents stated that the garage doors of the receiving bay were to be closed when the semi-trucks were unloading in the receiving bay. During multiple EPA and NDEE inspections, inspectors observed that the garage doors were not closed. NDEE also received odor complaints from the public when the garage doors were not closed. When the garage doors were not closed, the receiving pit off-gassed $H_2S$ that was not

captured by the ventilation system and was released into ambient air inside and outside of the building.

203.    As a result of Defendants' failure to install an odor control exhaust system, including an odor control unit, $H_2S$ continually released in the receiving bay was emitted in the air from the ventilation system outlets to the roof and ambient air.

204.    On or about August 28, 2018, as a result of Defendants' failure to install a hazardous exhaust system, including an odor control unit, and failure to properly train and enforce employee usage of personal $H_2S$ monitors and the respiratory protection procedures, an employee experienced $H_2S$ exposure symptoms and had to be admitted to a local hospital emergency room for observation and testing.

205.    The IMC Section 510.2 requires that, "The design of the system shall be such that the emissions are confined to the area in which they are generated by air currents, hood, or enclosures and shall be exhausted by a duct system to a safe location or treated by removing contaminants."

206.    Big Ox personnel access the roof twice per shift where the receiving bay exhaust was vented to take instrument readings from the biogas header. Employees spent a total of 15 minutes per shift taking readings from the biogas header and are, therefore, exposed to extremely hazardous substances that vent from the receiving bay area.

207.    The personal monitoring (four-gas monitors) data collected from Big Ox showed that personal monitors recorded exposure above IDLH when employees were on the roof of the building.

208.     As stated above, Big Ox identified the South Sioux City Municipal Code as an applicable element in its design drawings.

209.     The City of South Sioux City and emergency responders received 69 odor complaints from the public from approximately October 2016 to June 2019 in violation of South Sioux City Municipal Code Section 38.136.

210.     From approximately September 2016 to May 2019, Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), each day that it failed to design and maintain a receiving bay process handling area to avoid hazards by not connecting the receiving bay area to an odor control scrubber, as required by the original design. This design and maintenance failure may result in accidental release or explosion of $H_2S$.

211.     As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

### FOURTH CLAIM FOR RELIEF
### Improper Maintenance of the Biogas Skid System and Flare Operation Processes Which May Result in Accidental Releases or Explosion of Extremely Hazardous Substances

212.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

213.     The American National Standards Institute/American Petroleum Institute Standard (ANSI/API) 521 Pressure-relieving and Depressuring Systems is an International Standard applicable to pressure-relieving and vapor-depressuring systems. It includes a recommended minimum relief system design in which "… bellows vent to [a] safe location…"

214.    During an October 10, 2018, inspection, NDEE identified a pipe that Big Ox used to vent biogas to the atmosphere in the biogas clean up skid. This pipe was not included as an emission point in Big Ox's CAA Construction Permits.

215.    The pipe was approximately twelve (12) feet from the ground. There was a control room in the process area where an employee was stationed when the plant was operational. On November 7, 2018, as a result of the inspection finding, NDEE issued an NOV to Big Ox for an unpermitted flare bypass in violation of its CAA state construction permit.

216.    During the November 13-14, 2018, EPA CAA Section 112(r) Inspection, a Big Ox employee stated that there have been multiple flare bypass events of pure $CH_4$ gas with no mercaptan added (which is a chemical additive to natural gas that allows humans to detect the odor of natural gas) that each lasted longer than an hour.

217.    On a January 25, 2019, NDEE noted that a support beam at the gas cleanup skid was covered in oil, which was indicative of significant releases from the flare bypass.

218.    A direct release of CH4 from this vent can result in explosion.

219.    From approximately October 2018 to March 2019, Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), each day that it failed to design and maintain a safe facility in a manner to prevent accidental releases of extremely hazardous substances or explosion, as described in Paragraphs 212 to 218 above in the following ways: (1) failure to properly vent biogas; (2) failure to comply with EPA's ACOC by not identifying the vent in the skid as an emission point; (3) failure to control $CH_4$ releases during unpermitted bypass events; and (4) use of this unpermitted bypass to vent natural gas directly to the atmosphere.

220.    As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

## FIFTH CLAIM FOR RELIEF
### Failure to Design and Maintain a Pressure Relieving System on the Anaerobic Digestion Process Handling of Extremely Hazardous Substances Which May Result in Accidental Release or Explosion

221.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

222.    The Facility has four anaerobic digester PRVs, two located on each digester. Each PRV is approximately six feet tall.

223.    On August 2, 2018, Big Ox stated in a letter that it assumes the PRVs are activated when anaerobic digester pressure exceeds 18.5 inches of water column (the relief set point).

224.    Big Ox supplied data that show multiple PRV readings above 18.5 inches of water column, indicating that the PRVs were activated multiple times between approximately January 2018 and July 2018. This activation of the PRVs indicates that releases of $CH_4$, $H_2S$, and biogas from the PRVs into the work area on the roof of the building over digesters 1 and 2 occurred on a regular basis.

225.    Big Ox supplied personal $H_2S$ monitor data from approximately January 2018 to June 2018. During this time, the monitors recorded 35 $H_2S$ alarms while PRVs were releasing.

226.    The IMC Section 510.5.2 says, "The design of the system shall be such that the emissions are confined to the area in which they are generated by air currents, hoods or

enclosures and shall be exhausted by a duct system to a safe location or treated by removing contaminants."

227.    ANSI/API standard 521 for "pressure-relieving and de-pressuring systems" requires specific design considerations to adequately vent contaminants, including examining the principal causes of overpressure, determining individual relieving rates, and selecting and designing disposal systems, including such component parts as piping, vessels, flares, and vent stacks.

228.    Defendants failed to follow the ANSI/API and IMC industry standards and had multiple activations of the PRVs that exposed workers to $H_2S$, $CH_4$ and biogas from the digester.

229.    From approximately September 2016 to May 2019, Defendants violated Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1), each day that it failed to design and maintain a PRV system on its anaerobic digestion process handling of $H_2S$, $CH_4$ and biogas to avoid hazards which may result in accidental release or explosion of extremely hazardous substances.

230.    As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

### SIXTH CLAIM FOR RELIEF
### Failure to Monitor Releases and/or Quantify the Amount of Releases and Minimize the Consequences of Accidental Release of Extremely Hazardous Substances

231.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

232.    On multiple occasions between May 29, 2018 and January 25, 2019, Defendants failed to monitor for releases of biogas, $H_2S$, and $CH_4$ while anaerobic digesters overflowed and during PRV releases.

233.    On multiple occasions between May 29, 2018 and January 25, 2019, Defendants failed to minimize the consequences of the accidental releases of $H_2S$, $CH_4$, and biogas while anaerobic biodigesters overflowed and during PRV releases.

234.    On several occasions between approximately June 26 and August 13, 2018, EPA or NDEE monitored $H_2S$ and $CH_4$ ambient air concentrations around the Facility following the liquid biomass overflow event and found elevated levels of $H_2S$ and $CH_4$.

235.    The concentrations of $H_2S$ and $CH_4$ found during EPA and NDEE's ambient air monitoring indicated a potential acute human health hazard.

236.    On or about January 25, 2019, the Facility's digester overflowed approximately 60,000 to 80,000 gallons of liquid biomass.

237.    Big Ox did not conduct monitoring after the January 25, 2019, digester overflow but the monitors at the Facility showed an exceedance of the TRS standard.

238.    Big Ox failed to have "a gas detection system . . . to detect the presence of gas at or below the permissible exposure limit (PEL) or ceiling limit of the gas for which detection is provided." In addition, Big Ox did not have a system . . . capable of monitoring the discharge from the treatment system at or below one-half the IDLH limit." Both of these are requirements of the 2006 International Building Code at [F] 908.3 addresses highly toxic and toxic materials

239.     As stated above, Big Ox cited to the 2000 NFPA 101 Life Safety Code in its design documents.  Section 4.5.1 of the 2000 NFPA 101 Life Safety Code requires more than one safeguard for workers onsite.  The only safeguard provided by Big Ox to its employees was a personal monitor.

240.     EPA's Guidance to Protect POTW Workers From Toxic And Reactive Gases And Vapors, EPA 812-B-92-001 Chapter 3, and The Biogas Utilization Handbook, published by the Environment, Health, and Safety Division, Georgia Tech Research Institute, Atlanta, Georgia 1996 identify monitoring as a safeguard to protect workers.

241.     Defendants failed to prevent the release of extremely hazardous substances, including $CH_4$, $H_2S$ and biogas, during the digester overflow events.

242.     Defendants failed to minimize the consequences of accidental release of extremely hazardous substances by failing to conduct air monitoring during the overflow events.

243.     Defendants failed to maintain a safe facility and minimize the consequences of accidental releases which occurred, as required by Section 112(r)(1) of the CAA, 42 U.S.C. § 7412(r)(1).

244.     As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 39 above.

**Violations of CAA Construction Permit and Nebraska SIP**

**SEVENTH CLAIM FOR RELIEF**
**Violation of total reduced sulfur (TRS) standard**

245.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

246.     NDEE issued two CAA construction permits to the Facility.  Construction Permit CP15-008 was issued on April 5, 2016.  Construction Permit CP17-033 was issued on April 9, 2018.  CP17-033 supersedes permit CP15-008.  Both permits were issued pursuant to 129 Neb. Admin. Code § 17-001 *et seq*, which includes the TRS standard in Paragraph 30.

247.     This TRS standard is also part of the Nebraska SIP, 129 Neb. Admin. Code § 4-001 *et seq*.

248.     Based on the information gathered and the operation of the Facility, EPA discovered that Defendants violated the TRS standard a total of 39 times between approximately June 26 and 28, 2018.

249.     Any permit noncompliance shall constitute a violation of NEPA and the CAA and is grounds for enforcement action or permit revocation.  129 Neb. Admin. Code §§ 41-001 *et seq*., 17-001 *et seq*., and CP17-033 Condition I. (B).

250.     As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Visible Emission Standard

251.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

252.     After the digester overflow in approximately May 2018, Big Ox applied dry lime to clean up the overflowing digester material.

253.     Permit CP17-033 General Conditions (I)(1) incorporates the visible emission standard found at 129 Neb. Admin. Code § 32-001.

254.      Between July-August 2018, large plumes of particulate matter were released in the ambient air beyond the fence line as a result of the Defendants' application of dry lime.

255.     The releases of particulate matter are violations of 129 Neb. Admin. Code § 32-001 and Permit CP17-033 General Conditions (I)(1), which incorporates the Nebraska SIP.

256.     Any permit noncompliance shall constitute a violation of NEPA and the CAA, and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B). As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## NINTH CLAIM FOR RELIEF
### Operation of Biogas Flare in Excess of Construction Permit Limit

257.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

258.     Permit CP15-008, Condition  II. (A)(3)(c), states that EU 06 (biogas  flare) shall be limited  to 500 hours of operation  per any period of twelve consecutive  calendar months.

259.     Between approximately  January 2018 and April 2018, Big Ox operated the biogas flare for more than 500 hours.

260.     Any permit noncompliance  shall constitute a violation  of NEPA and the CAA, and is grounds for enforcement action or permit revocation.  129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition  I. (B).

261.     As a result of the above-listed  violations,  pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b),  and NEPA, Neb. Rev. Stat. §§ 81-1508,  1508.02,  Defendants are liable  for the assessment of civil penalties  to the United States and the State of not more than the per-day per-violation  amounts set forth in Paragraphs 39 and 85 above.

## TENTH CLAIM FOR RELIEF
### Failure to Operate Digesters to Prevent Excess Emissions

262.     Paragraphs 1 through 160 are re-alleged and incorporated  here by reference.

263.     Big Ox's construction permit CP17-033 includes Specific Condition  II(C) and requires that, "All permitted  emission  units,  associated emissions  conveyances, required control equipment,  and required monitoring  equipment  shall be properly installed,  operated, and maintained.  {Chapter 34, Section 006} (1) All emissions  from emission  units using required controls shall be captured and routed through associated emission  conveyances to the required control equipment,  except for: (a) Uncaptured emissions  due to the design of the equipment,  or,

(b) Uncaptured emissions described in the permit application and any additional information submitted prior to per limit issuance."

264.    The permit recognizes the following as emission points: "III. (A) Specific Conditions for Anaerobic Digestion. (1) Permitted Emission Points: The source is permitted to construct the emission points and associated emission units identified in the following table at the capacities and using the fuel types listed: EP06 and EP07."

265.    PRV data showed that excess emissions were occurring from the digester almost continuously.

266.    Emissions of extremely hazardous substances occurred through a hole in the access hatch on top of the digesters. In addition, these access hatches were left open to vent biogas and introduce water into the digester to ease foaming.

267.    The hole in the hatch on top of the digesters is an unpermitted emissions source and is a violation of the construction permit.

268.    By venting biogas, the open access hatches are unpermitted emissions sources and the emissions are a violation of the construction permit.

269.    Any permit noncompliance shall constitute a violation of NEPA and the CAA, and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B).

270.    As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for

the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## ELEVENTH CLAIM FOR RELIEF
### Violation of Permitted Flow Rate for Biogas Flare (EU06)

271.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

272.     Big Ox's construction permit CP17-033 III(A)(3) limits the flow rate of the Biogas Flare (EU06) to 2167 standard cubic feet (scf) over a 30-minute period.

273.     The Biogas Flare (EU06) exceeded its permitted limit of 2167 scf over a 30-minute period at least160 times between approximately July 2017 and August 2018.

274.     Any permit noncompliance shall constitute a violation of NEPA and the CAA, and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B). As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## TWELFTH CLAIM FOR RELIEF
### Violation of $H_2S$ Permit Limit for Biogas Flare (EU06)

275.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

276.     Big Ox's construction permit CP17-033 III(A)(3)(g) contains an $H_2S$ limit of 2300 ppm over a thirty-minute period for Biogas Flare (EU06).

277.    Digester biogas routed to the Biogas Flare (EU06) exceeded the permitted $H_2S$ limit of 2300 ppm over a thirty-minute period from approximately June through July 2018, at least 32 times.

278.    Flare data along with combined gas reading demonstrate that from approximately June through July 2018, biogas containing quantities above 2300 ppm of $H_2S$ were sent to the Flare.

279.    Any permit noncompliance shall constitute a violation of NEPA and the CAA, and is grounds for enforcement action or permit revocation.  129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B).  As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## THIRTEENTH CLAIM FOR RELIEF
### Failure to Install CEMS for the Biogas Flare (EU06)

280.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

281.    Big Ox's construction permit CP17-033 III(A)(3)(1) requires installation of a Continuous Emissions Monitoring System ("CEMS") prior to operation of its Biogas Flare (EU06).

282.    Defendants failed to install the CEMS prior to operation of the Biogas Flare.

283.     Any permit noncompliance shall constitute a violation of NEPA and the CAA and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B). As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## FOURTEENTH CLAIM FOR RELIEF
### Violation of $H_2S$ Permit Limit for Biogas Scrubber Skid (EP07)

284.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

285.     Big Ox's construction permit CP17-033 III.A(3)(h) includes a limit of 667 parts per million (ppm) $H_2S$ over a 30-minute period for biogas routed to the Biogas Scrubber Skid (EP07).

286.     Digester biogas routed to the Biogas Scrubber Skid (EP07) exceeded the $H_2S$ limit of 667 ppm over 30-minute period limit at least 10 (ten) times from approximately April 2018 to June 2018.

287.     Any permit noncompliance shall constitute a violation of NEPA and the CAA and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B). As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States

and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## FIFTEENTH CLAIM FOR RELIEF
### Failure to Conduct Initial Performance Test within 180 Days of Permit Issuance

288.   Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

289.   Big Ox's construction permit CP17-033 Sections II(D) and III(A) require that Big Ox conduct an initial performance test within 180 days of permit issuance on EP07. Big Ox's permit was issued on April 9, 2018. Therefore, Defendants should have completed the initial performance test by October 9, 2018.

290.   Big Ox did not submit a final test report to EPA or NDEE demonstrating the performance test was completed in accordance with the permit.

291.   Any permit noncompliance shall constitute a violation of NEPA and the CAA, and is grounds for enforcement action or permit revocation. 129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B). As a result of the above-listed violation, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b), and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

## SIXTEENTH CLAIM FOR RELIEF
### Unpermitted Flare Bypass

292.   Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

293.     Big Ox's construction permit does not permit bypassing of the biogas flare (EU06).

294.     At all times relevant to this Complaint, Big Ox illegally vented biogas through a bypass to their flare on at least 114 occasions between approximately October 2018 and February 2019.

295.     Any permit noncompliance shall constitute a violation of NEPA and the CAA and is grounds for enforcement action or permit revocation.  129 Neb. Admin. Code §§ 41-001 *et seq.*, 17-001 *et seq.*, and CP17-033 Condition I. (B).  As a result of the above-listed violations, pursuant to Section 113(b) of CAA, 42 U.S.C. § 7413(b),  and NEPA, Neb. Rev. Stat. §§ 81-1508, 1508.02, Defendants are liable for the assessment of civil penalties to the United States and the State of not more than the per-day per-violation amounts set forth in Paragraphs 39 and 85 above.

**Clean Water Act Violations**

**SEVENTEENTH CLAIM FOR RELIEF**
**Pass Through and Interference Violations**

296.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

297.     Sioux City's NPDES permit for its municipal wastewater treatment plant, Permit IA0043095, includes effluent numeric criteria for BOD, expressed in terms of carbonaceous biochemical oxygen demand (CBOD), TSS, ammonia nitrogen ($NH_3$), total residual chlorine, oil and grease, dissolved oxygen, pH, E.coli, and toxicity.

298.    As described in Paragraphs 49 to 55bove, the General Pretreatment Regulations prohibit an "industrial user" from "introduc[ing] any pollutant(s) into a POTW which cause Pass Through or Interference." 40 C.F.R. §403.5(a)(1).

299.    As described above in Paragraphs 142 - 145 above, in approximately March 2018, Big Ox's centrifuge system which removed solids that had been processed by the digesters failed. This resulted in recurring discharges to the POTW of elevated levels of TSS.

300.    As a result of the Big Ox Facility's increased loading to the POTW of TSS, from approximately November 2017 through February 2019, the Sioux City exceeded its TSS plant capacity of 69,679 lbs./day monthly average twelve times, constituting Interference as defined by Sioux City's NPDES Permit IA0043095 and the General Pretreatment Regulations, 40 C.F.R. Part 403.

301.    The Sioux City NPDES Permit IA0043095 identifies a 45 mg/l limit for TSS for a 7-day average and 30 mg/l for a monthly average.

302.    The City exceeded its 7-day average concentration limit for TSS in November 2017 and January 2019.

303.    The City exceeded the TSS 7-day average limit four (4) times in February 2019.

304.    The City exceed the monthly average limit violations for January and February 2019.

305.    Excessive TSS can inhibit ammonia removal. After the high TSS loading from Big Ox, Sioux City's ability to treat ammonia was significantly inhibited and ammonia levels

leaving the plant increased because the high TSS load limited the formation of ammonia removing bacteria.

306.    The City exceeded its permitted daily maximum ammonia limits approximately three (3) times between approximately March and May of 2018.

307.    The City exceeded its permitted mass CBOD limit of 3670 lb./day, 30-day average one time, in February 2019.

308.    The City exceeded its permitted concentration CBOD limit of 25 mg/l, 30-day average, one time in February 2019.

309.    The discharges from Big Ox's Facility, which alone or in conjunction with the discharge or discharges from other sources, have caused or contributed to the violations stated above and constitute interference and/or pass through at the POTW in violation of the General Pretreatment Regulations, 40 C.F.R. Part 403

310.    As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 71 above.

### EIGHTEENTH CLAIM FOR RELIEF
### Compliance Order, Pretreatment Permit and NOV Violations

311.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

312.    Sioux City issued the Facility a Pretreatment permit to Big Ox on May 2, 2016, and amended it on January 31, 2017. This permit did not contain a numeric TSS limit.

313.     As described above in Paragraphs 142 - 145 above, on or about March 2018, Big Ox had multiple centrifuge failures that resulted in significant amounts of TSS entering the Sioux City POTW.

314.     On June 29, 2018, Sioux City issued an order to Big Ox containing TSS limits based on the Sioux City POTW's capacity of a monthly average of 20,000 lbs./day.

315.     From approximately July 2018 through November 2018, Big Ox violated its TSS monthly average limit of 20,000 lbs./day established in the City's June 29, 2018 Order 19 times.

316.     On August 2, 2018, Sioux City issued a NOV to Big Ox establishing TSS sampling and flow reporting deadlines.

317.     Defendants did not comply with the sampling deadlines for August 22, 2018, September 3, 2018, and September 4, 2018.

318.     On November 25, 2018, Sioux City amended Big Ox's Pretreatment permit, to include numeric TSS limits of 20,000 lbs./day.  The permit also included a daily discharge limit of 48,509 lbs./day.

319.     From approximately December 2018 to January 2019, Defendants violated the monthly average limit of TSS two times and its daily maximum limit 15 times.

320.     As a result of the above-listed violations, pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Defendants are liable for the assessment of civil penalties to the United States of not more than the per-day per-violation amounts set forth in Paragraph 71 above.

**NEPA Violations**

**NINETEENTH CLAIM FOR RELIEF**
**Discharges of Non-Storm Water in Violation of Permit NER910000**
**and Neb. Rev. Stat. § 81-1506**

321.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

322.    NDEE issued NPDES Authorization NER910002, on July 26, 2016, to Big Ox to allow discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

323.    Big Ox was required to comply with the terms and conditions of NER910000 beginning on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization of coverage under the permit was revoked.

324.    Under NEPA, it is unlawful to "[d]ischarge any pollutant into waters of the state without obtaining a permit as required by the [NPDES] ...." Neb. Rev. Stat. § 81-1506(2)(a); *see also* 119 Neb. Admin. Code § 10-002. It is also unlawful to violate any permit condition or limitation. Neb. Rev. Stat. § 81-1508.02(1)(b).

325.    Permit NER910000 includes Permit Condition 1.1.4.1, which provides: "Storm[]water discharges that are mixed with non-storm[]water, other than those discharges listed in Part 1.1.3, are not eligible for coverage under this permit." Allowable non-storm water discharges are listed in Permit NER910000.

326.    Additionally, Permit Condition 2.1.2.10 provides "You must eliminate non-storm[]water discharges not authorized by an NPDES permit. See Part 1.1.3 for a list of non-storm[]water discharges authorized by this permit."

327.     On at least 32 occasions between approximately December 2017 and January 2019, liquid biomass, in quantities of tens or hundreds of thousands of gallons, was released from the Facility's digesters through its air emission points and onto the roof of the building. From the roof of the building, the liquid biomass exited over the side(s) of the building and onto ground where the liquid biomass mixed with storm water and discharged off the property and to a water of the State on at least 16 occasions.

328.     The liquid biomass is a "pollutant" as defined in 119 Neb. Admin. Code § 1-087.

329.     The mixture of storm water and liquid biomass running off the property were unlawful discharges, as defined in 119 Neb. Admin. Code § 1-038, of a pollutant from a point source as defined in *id*. § 1-086.

330.     Liquid biomass is not an allowable non-storm water discharge under Permit NER910000 and, thus, the discharge was not covered by Permit NER910000.

331.     Because NER910000 did not authorize the discharges of liquid biomass mixed with storm water that ran off the property to waters of the State, these discharges of liquid biomass mixed with surface runoff were unlawful discharges of a pollutant from a point source into waters of the state without a permit in violation of NEPA. Neb. Rev. Stat. § 81-1506.

332.     Defendants also failed to eliminate the non-storm water discharges of liquid biomass not authorized by Permit NER910000, as required by Permit Condition 2.1.2.10.

333.     Between approximately December 2017, and January 2019, Defendants violated Neb. Rev. Stat. § 81-1506(2)(a) and/or Neb. Rev. Stat. § 81-1508.02(1)(b) on at least 16 occasions.

334.    Pursuant to Neb. Rev. Stat. §81-1508.02(2), a civil penalty not to exceed ten thousand dollars ($10,000.00) per day per violation is provided for violations of NEPA, or any rules or regulations adopted and promulgated pursuant to such Act.

## TWENTIETH CLAIM FOR RELIEF
## Failure to Provide Written Discharge Reports in Violation of Permit NER910000

335.    Paragraphs 1 through 160 are realleged and incorporated here by reference.

336.    NDEE issued NPDES Authorization NER910002, on July 26, 2016, to Big Ox to allow discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

337.    Big Ox was required to comply with the terms and conditions of NER910000 beginning on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization of coverage under the permit was revoked. It is unlawful to violate any permit condition or limitation.   Neb. Rev. Stat. § 81-1508.02(1)(b).

338.    Permit NER910000 includes Permit Condition 7.2, which requires: a written submission to be provided within five days of the time Big Ox becomes aware of a non-storm water discharge.

339.    Big Ox never submitted written follow-up reports to NDEE within five days of non-storm water discharges of liquid biomass occurring on at least 16 occasions between approximately December 2017 and January 2019.

340.    Defendants failed to comply with Permit Condition 7.2 on at least 16 occasions and, thus, violated Neb. Rev. Stat. § 81-1508.02(1)(b).

341.     Pursuant to Neb. Rev. Stat. § 81-1508.02(2),  a civil penalty not to exceed ten

thousand dollars ($10,000.00)  per day per violation  is provided for violations  of NEPA or any

rules or regulations  adopted and promulgated  pursuant to such Act.

**TWENTY-FIRST  CLAIM FOR RELIEF**
**Failure to Provide Adequate Containment in Violation of Permit NER910000**

342.     Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

343.     NDEE issued NPDES Authorization  NER910002, on July 26, 2016, to Big Ox to

allow discharge of storm water under the terms and conditions  of NPDES Industrial Storm Water

General Permit NER910000.

344.     Big Ox was required to comply with the terms and conditions  of NER910000

beginning  on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization  of

coverage under the permit was revoked.  It is unlawful to violate any permit condition  or

limitation.   Neb. Rev. Stat. § 81-1508.02(1)(b).

345.     Permit NER910000 includes Permit Condition  2.1.2, which requires non-numeric

technology-based  effluent limits.  Specifically,  a permittee must "minimize  the exposure of

manufacturing,  processing, and material storage areas … to rain, snow, snowmelt, and runoff by

either locating these industrial  materials and activities  inside or protecting them with storm

resistant coverings."  Additionally,  a permittee "must divert, reuse, contain, or otherwise reduce

storm[]water runoff, to minimize  pollutants  in [its] discharges."

346.     Between approximately  December 2018, and June 2019, Big Ox was stockpiling

digester solids  at its Facility.

347.     During this time period, Big Ox had stockpiled over 13,000 tons of digester solids on the grounds of the Facility property.

348.     The digester solids are an industrial material and a pollutant as set forth in Permit NER910000 and 119 Neb. Admin. Code § 1-087.

349.     On January 2, 2019, NDEE conducted a site visit and observed lack of adequate containment or implementation of controls for the stockpiles of digester solids at the Facility.

350.     On January 7, 2019, NDEE issued an NOV alleging Big Ox was not adequately containing the digester solids or implementing controls to prevent digester solids runoff from mixing with storm water and discharging off the property.

351.     NDEE conducted additional site visits in January 2019 and March 2019 and observed evidence of non-storm water runoff from the digester solids, inadequate containment, and lack of controls.

352.     On June 19, 2019, NDEE conducted a site visit and observed all the stockpiles of digester solids has been removed.

353.     While stockpiling digester solids on the ground of its Facility, Defendants failed to implement adequate controls to contain runoff from the digester solids.

354.     Defendants violated Permit Condition 2.1.2 of NER910000 for approximately 181 days and, thus, violated Neb. Rev. Stat. § 81-1508.02(1)(b).

355.     Pursuant to Neb. Rev. Stat. § 81-1508.02(2), a civil penalty not to exceed ten thousand dollars ($10,000.00) per day per violation is provided for violations of NEPA or any rules or regulations adopted and promulgated pursuant to such Act.

## TWENTY-SECOND CLAIM FOR RELIEF
### Failure to Implement Good Housekeeping Measures in Violation of Permit NER910000

356.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

357.    NDEE issued NPDES Authorization NER910002, on July 26, 2016, to Big Ox to allow discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

358.    Big Ox was required to comply with the terms and conditions of NER910000 beginning on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization of coverage under the permit was revoked. It is unlawful to violate any permit condition or limitation.   Neb. Rev. Stat. § 81-1508.02(1)(b).

359.    Permit NER910000 includes Permit Condition 2.1.2.2, which requires non-numeric technology-based effluent limits.  Specifically, a permittee must "keep clean all exposed areas that are potential sources of pollutants, using such measures as sweeping at regular intervals, keeping materials orderly and labeled, and storing materials in appropriate containers."

360.    On January 2, 2019, NDEE conducted a site visit and observed a large amount of industrial wastes or materials, which are pollutants, being tracked across the Facility.

361.    On January 11, 2019, NDEE conducted a site visit and observed a large amount of material being tracked out across the Facility in the same areas as indicated during January 2, 2019 site visit.

362.    On January 25, 2019 and February 28, 2019, NDEE conducted site visits and observed material being tracked out by traffic leaving the Facility.

363.     On March 28, 2019, NDEE conducted another site visit and observed material being tracked across the Facility.

364.     Defendants failed to implement good housekeeping measures to keep areas clean and prevent track out areas.

365.     Defendants violated Permit Condition 2.1.2.2 of NER910000 and, thus, violated Neb. Rev. Stat. § 81-1508.02(1)(b).

366.     Pursuant to Neb. Rev. Stat. § 81-1508.02(2), a civil penalty not to exceed ten thousand dollars ($10,000.00) per day per violation is provided for violations of NEPA or any rules or regulations adopted and promulgated pursuant to such Act.

**TWENTY-THIRD CLAIM FOR RELIEF**
**Failure to List Potential Pollutant Sources in Violation of Permit NER910000**

367.     Paragraphs 1 through 160 are realleged and incorporated here by reference.

368.     NDEE issued NPDES Authorization NER910002, on July 26, 2016, to Big Ox to allow discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

369.     Big Ox was required to comply with the terms and conditions of NER910000 beginning on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization of coverage under the permit was revoked. It is unlawful to violate any permit condition or limitation. Neb. Rev. Stat. § 81-1508.02(1)(b).

370.     Permit NER910000 includes Permit Condition 5.1.3, which includes requirements pertaining to potential pollutant sources. Specifically, a permittee must:

- 65 -

> [D]ocument areas at [the] facility where industrial materials or activities are exposed to storm[]water and from which allowable non-storm[]water discharges are released. Industrial materials or activities include, but are not limited to: material handling equipment or activities; industrial machinery; raw materials; industrial production and processes; and intermediate products, by-products, final products, and waste products. Material handling activities include, but are not limited to: the storage, loading and unloading, transportation, disposal, or conveyance of any raw material, intermediate product, final product or waste product.

The description of each area must include the list of industrial activities exposed to storm water and list the pollutant(s) or pollutant constituents associated with each identified activity.

371.    Permit NER910000 also required Big Ox to have a SWPPP prepared. The Facility's SWPPP indicates it was originally created in June 2016, revised in March 2017, and rewritten in February 2019.

372.    On January 2, 2019, NDEE conducted a site visit and observed stockpiles of digester solids, paunch manure, and track out of material. NDEE made similar observations during site visits conducted on January 11, 2019, January 25, 2019, and January 31, 2019.

373.    Digesters solids, paunch manure, and the track out materials are industrial materials and pollutants and, thus, are potential pollutant sources. *See* Permit NER910000 and 119 Neb. Admin. Code § 1-087.

374.    The Facility's SWPPP did not list digester solids, paunch manure, or track out as potential pollutant sources.

375.    On January 7, 2019, NDEE issued an NOV notifying Big Ox that it needed to update its SWPPP to account for digester solids, paunch manure, and track out as potential pollutant sources. The NOV required Big Ox to submit an updated SWPPP by January 31, 2019.

376.    Big Ox, however, did not submit the revised SWPPP to NDEE until December 23, 2019. The revised SWPPP received by NDEE indicated it had been initially revised on June 16, 2016, rewritten on February 1, 2019, and revised again on December 5, 2019.

377.    Defendants violated Permit Condition 5.1.3 of NER910000 and, thus, violated Neb. Rev. Stat. § 81-1508.02(1)(b).

378.    Pursuant to Neb. Rev. Stat. § 81-1508.02(2), a civil penalty not to exceed ten thousand dollars ($10,000.00) per day per violation is provided for violations of NEPA or any rules or regulations adopted and promulgated pursuant to such Act.

### TWENTY-FOURTH CLAIM FOR RELIEF
### Failure to Implement Control Measures for Potential Pollutant Sources in Violation of Permit NER910000

379.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

380.    NDEE issued NPDES Authorization NER910002, on July 26, 2016, to Big Ox to allow the discharge of storm water under the terms and conditions of NPDES Industrial Storm Water General Permit NER910000.

381.    Big Ox was required to comply with the terms and conditions of NER910000 beginning on July 18, 2016, and ending on January 21, 2020, when Big Ox's authorization of coverage under the permit was revoked. It is unlawful to violate any permit condition or limitation.  Neb. Rev. Stat. § 81-1508.02(1)(b).

382.    Permit NER910000 includes Permit Condition 5.1.4.1, which requires the permittee to "document the location and type of control measures [it has] installed and implemented at [the] site to achieve the non-numeric effluent limits in Part 2.1.2 …." The permittee must also "describe how the control measures at [the] site address both the pollutant sources identified in Part 5.1.3, and any storm[]water run-on that commingles with any discharges covered under this permit."

383.    Permit NER910000 also required Big Ox to have a SWPPP prepared. The Facility's SWPPP indicates it was originally created in June 2016, revised in March 2017, and rewritten in February 2019.

384.    On January 2, 2019, NDEE conducted a site visit and observed a lack of control measures to address the stockpiled digester solids, paunch manure, and track out of material. NDEE made similar observations during site visits conducted on January 11, 2019, January 25, 2019, and January 31, 2019.

385.    Big Ox had not implemented control measures to address the piles of digester solids and paunch manure or track out.

386.    The Facility's SWPPP also did not contain control measures to address the potential pollutant sources of digester solids, paunch manure, and track out.

387.    On January 7, 2019, NDEE issued an NOV notifying Big Ox that control measures had not been implemented to address the potential pollutant sources of digester solids, paunch manure, and track out.

388.    Big Ox submitted a revised SWPPP to NDEE in December 2019.  The revised SWPPP received by NDEE indicated it had been initially revised on June 16, 2016 and rewritten on February 1, 2019.

389.    Defendants violated Permit Condition 5.1.4 of NER910000 and, thus, violated Neb. Rev. Stat. § 81-1508.02(1)(b).

390.    Pursuant to Neb. Rev. Stat. § 81-1508.02(2), a civil penalty not to exceed ten thousand dollars ($10,000.00) per day per violation is provided for violations of NEPA or any rules or regulations adopted and promulgated pursuant to such Act.

### TWENTY-FIFTH CLAIM FOR RELIEF
### EV 30 Assumption of Liability For
### Environmental Claims Against Big Ox

391.    Paragraphs 1 through 160 are re-alleged and incorporated here by reference.

392.    In an agreement dated July 31, 2020, which, among other matters, changed the ownership of NEBO, EV 30 agreed to assume liability for environmental claims by EPA and other regulators against Big Ox.

393.    EV 30's assumption of liability for environmental claims against Big Ox includes Claims 1 through 24 above.

394.    EV 30 is liable to the United States and the State of Nebraska for any civil penalties assessed for the claims in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Nebraska, respectfully request that the Court grant the following relief:

1.      Under 42 U.S.C. § 7413(b) assess civil penalties against Defendants of up to $102,638 per day for each violation of the CAA occurring after November 2, 2015, and assessed after December 23, 2020;

2.      Under 33 U.S.C. § 1319(b) and (d), assess civil penalties against Defendants of up to $37,500 per day for each violation of the CWA occurring between December 6, 2013, and November 2, 2015, and up to $56,460 per day for each violation occurring after November 2, 2015 and assessed after December 23, 2020;

3.      Under Neb. Rev. Stat. § 81-1508.02(2), assess civil penalties against Defendants of up to $10,000 per day for each day of each violation;

4.      Grant such other relief as the Court deems just and proper.


Respectfully submitted,



NATHANIEL DOUGLAS
Deputy Chief
Environment & Natural Resources Division
United States Department of Justice
PA Bar Number: 18217

*s/ Joanna Citron Day*
JOANNA CITRON DAY

- 70 -

Senior Counsel
DC Bar Number: 477833
DAVID DAIN
Senior Counsel
CO Bar Number: 12224
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-3394
Joanna.day@usdoj.gov

United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-3394
Joanna.day@usdoj.gov

JAN W. SHARP
Acting United States Attorney
District of Nebraska

Assistant United States Attorney
District of Nebraska
1620 Dodge St., Suite 1400
Omaha, NE 68102
Telephone

Attorneys for Plaintiff
United States Environmental Protection Agency

DOUGLAS J. PETERSON, #18146
*Attorney General of Nebraska*

*s/ Maegan L. Woita*
JUSTIN D. LAVENE, #22178
MAEGAN L. WOITA, #26287
*Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
2115 State Capitol

- 71 -

Lincoln, Nebraska 68509
Telephone: (402) 471-1912
Fax: (402) 471-1929
justin.lavene@nebraska.gov
maegan.woita@nebraska.gov

Attorneys for Plaintiff
State of Nebraska


OF COUNSEL:

SARA HERTZ WU
Office of Regional Counsel
United States Environmental Protection Agency, Region 7
11201 Renner Blvd.
Lenexa, Kansas 66219
Telephone: 913-551-7316
Email: hertzwu.sara@epa.gov

(NICOLE) LINDSAY SIMMONS
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460
Telephone: 202-564-3223
Email: simmons.nicole@epa.gov

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the Complaint (Dkt. 1), the foregoing Unopposed Motion to Enter Stipulation (Dkt. 2), the Stipulation of Settlement (Dkt. 2-1), and the Proposed Order to be served upon the following counsel for the Defendants by email because formal service has been waived.

     William M. Guerry
     Kelley Drye & Warren LLP
     Washington Harbour, Suite 400
     3050 K Street, NW
     Washington, DC 20007
     Tel: (202) 342-8858
     Fax: (202) 342-8451
     wguerry@kelleydrye.com

                                         s/ Joanna Citron Day
                                         Joanna Citron Day
                                       Senior Counsel
                                         U.S. Department of Justice